UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JACOB CLAVER, et al., Plaintiff(s), v. ZACH RECTOR, et al., Defendant(s). | CASE NO. C26-84-KKE<br><br>ORDER GRANTING IN PART MOTIONS FOR EXPEDITED RELIEF UNDER WASHINGTON'S UNIFORM PUBLIC EXPRESSION PROTECTION ACT OR FOR JUDGMENT ON THE PLEADINGS |

Plaintiff Jacob Claver, along with his two businesses, brought this lawsuit for defamation and other torts against Defendants Zach Rector; Rector's company, Entrepreneur Exposed, LLC ("Entrepreneur"); and Caleb & Brown Pty. Ltd. The lawsuit centers around three videos Rector recorded and posted to various social media platforms as well as an email written by an associate of Caleb & Brown to one of the firm's clients. Plaintiffs allege that these videos and the client email contained defamatory and otherwise tortious statements about Claver and his enterprises. Rector and Entrepreneur filed a motion for expedited relief under Washington's Uniform Public Expression Protection Act ("UPEPA") or, in the alternative, for judgment on the pleadings. Dkt. No. 15. And Caleb & Brown filed its own motion seeking the same relief. Dkt. No. 35.

The Court will grant both motions in large part and dismiss Plaintiffs' amended complaint. Plaintiffs fail to identify an actionably false statement in Rector's videos. And because Caleb & Brown issued a timely clarification to its client—which, under Washington law, forecloses

damages for loss of reputation or goodwill—Plaintiffs fail to plausibly allege recoverable damages arising out of Caleb & Brown's email. Plaintiffs' remaining claims fail for related reasons.

The Court also finds that, under UPEPA, Rector and Entrepreneur are entitled to recover attorney's fees and costs related to their motion, but that a statutory exception precludes Caleb & Brown from recovering the same. Finally, the Court will grant leave to amend.

## I. BACKGROUND

According to the amended complaint, Plaintiff Jacob Claver is an "expert in digital assets, blockchain, and Web3 technologies" with over 500,000 followers across his social media platforms. Dkt. No. 9 ¶ 20–21. Along with providing "educational content" on topics related to finance and digital currencies, he runs two companies: Plaintiffs Digital Ascension Group ("DAG"), which "specializes in helping high net worth individuals and family offices structure, protect, and grow cryptocurrency and digital investments"; and Digital Wealth Partners ("DWP"), "an SEC-registered investment advisor that integrates traditional portfolio management with the evolving digital asset landscape." *Id.* ¶¶ 21, 24–25.

The amended complaint describes Rector as "an analyst and social media content creator focusing on the digital asset and cryptocurrency space[.]" Dkt. No. 9 ¶ 3. Rector is the sole member of Entrepreneur (whose business is not described in the amended complaint). *Id.* ¶ 14. He also allegedly "has an affiliate relationship with" Caleb & Brown, a cryptocurrency brokerage based in Melbourne, Australia that is a competitor to DAP and DWP. *Id.* ¶¶ 15, 34, 36.

In 2023, Claver and Rector met at an event in Las Vegas where they were both speakers. Dkt. No. 9 ¶ 27. Over the ensuing months, Claver alleges, the two "bonded over a shared interest in private equity deals," participated in other events, recorded a podcast episode together, and collaborated on several business arrangements. *Id.* ¶¶ 28–29, 31. The relationship begin to fray, however, in 2024 and 2025, after Rector learned of a lawsuit against Claver then pending in the

U.S. District Court for the Western District of New York. *Id.* ¶ 30; *see Verivend Inc. v. Claver*, No. 1:23-cv-01289 (W.D.N.Y.).[1]

In that lawsuit, filed at the end of 2023, a payments processing company, Verivend Inc., sued Claver for allegedly fabricating emails and wire confirmations falsely showing that Claver had initiated a wire transfer using Verivend's platform. *See* Dkt. No. 16-1. According to the lawsuit, Claver had promised to raise money for a company affiliated with someone named Dirk Schepens. *Id.* ¶¶ 28, 56. Claver allegedly lied to Schepens that he had initiated a wire transfer of funds Claver had purportedly raised and that Verivend had failed to process the transfer. *Id.* ¶ 52. To buttress the lie, Claver allegedly registered a domain name similar to Verivend's, used that domain to falsify emails appearing to be from Verivend employees discussing the transfer, and manufactured a screenshot of a "Verivend wallet dashboard" indicating an available balance of over a million dollars. *Id.* ¶¶ 29, 32–33, 44–52.

Claver admitted much of this misconduct in his answer. *See* Dkt. No. 16-2. For instance, he admitted "that he registered the domain 'verivend.support'"; "sent emails to third-parties with images of purported wire transfers approved by Verivend"; and "blamed Verivend for delayed or failed wire transfers." *Id.* ¶ 3. He further admitted "that he fabricated purported Verivend wire transfer confirmations and conversations between himself and Verivend that never occurred." *Id.* And he admitted that "he manufactured the image" of the Verivend wallet, misled Schepens (multiple times) about having had conversations with Verivend executives, and impersonated Verivend employees on several occasions to generate fake email threads he could share with Schepens. *Compare* Dkt. No. 16-1 ¶¶ 32–52, *with* Dkt. No. 16-2 ¶¶ 32–52. Claver also admitted

[1] The Court takes judicial notice of the pleadings from the *Verivend* lawsuit for the purpose of establishing the existence of the allegations and admissions therein. Such "court filings and other matters of public record" are subject to judicial notice because their accuracy can be readily determined from sources whose accuracy cannot be reasonably questioned. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *see also* FED. R. EVID. 201(b)(2).

that, on a separate occasion, he told a different company's executive he had raised funds for that company, falsified wire transfer confirmations, and blamed the delayed transfer on Verivend—i.e., substantially the same deception he employed on Schepens. *Compare* Dkt. No. 16-1 ¶¶ 62–66, *with* Dkt. No. 16-2 ¶¶ 62–66. In early 2025, Claver, DAG, and Verivend settled the case without "admission of wrongdoing"; and the court entered a stipulated order enjoining Claver and DAG from engaging in similar deceptive acts. *See* Dkt. No. 29-3

In December 2025, Rector posted videos referencing the *Verivend* lawsuit that Claver alleges contained defamatory statements. Dkt. No. 9 ¶¶ 40, 42. The first was a December 30 live stream from Rector's X account (formerly Twitter) and the second was a two-part video released the next day titled "Addressing Jake Claver lies" ("Part 1" and "Part 2"). *Id.* Plaintiffs identify five purportedly defamatory statements from these videos. In the first, as quoted in the amended complaint, Rector said that Claver "lied … about some things that happened in the past" and "lied to me about their[2] business history about a lawsuit that involved their private equity dealings[.]" *Id.* ¶¶ 40, 72.a (ellipses in original). Plaintiffs understand these comments to suggest that Claver tried to conceal information about the *Verivend* lawsuit from Rector when the two were considering going into business together. *Id.* ¶ 40. The amended complaint partially quotes or paraphrases the other four allegedly defamatory statements as follows:

> "lies are being told" by Mr. Claver to the public based on DWP's funds and that "publicly he [Mr. Claver] is making claims that are not true."
>
> Mr. Claver has "covered up … his frauds."
>
> Mr. Claver has lied to the public about the "returns, or lack thereof, in Digital Wealth Partners."

[2] Although not apparent from the amended complaint, the transcripts of the videos—which both parties agree are incorporated by reference into the complaint—indicate that the plural possessive pronoun "their" refers to Claver and his business partner, Max Avery. Dkt. No. 16-3 at 5:10–16.

> Plaintiffs are not undertaking a third-party audit and accordingly have not accurately disclosed performance to investors.

*Id.* ¶ 72.b–.e (alterations in original).

According to Plaintiffs, after Rector published his videos, Caleb & Brown began "weaponizing" the videos to dissuade clients from transferring assets from Caleb & Brown to its competitor, DWP. Dkt. No. 9 ¶¶ 51–55. In particular, Plaintiffs allege that, in January 2026, a Caleb & Brown associate told one of the firm's clients who was considering transferring assets to DWP "that DWP's yield is not possible" and "warned the client to be 'cautious' and 'more informed.'" *Id.* ¶ 53. The next day, the associate followed up with an email that contained the phrase "you're very vulnerable to being scammed" (the amended complaint omits the quote's context). *Id.* ¶ 54. The email went on to state (again, as quoted in the amended complaint):

> Its much like Celsius back in the day where high yields were promised to increase AUM, whilst the mechanics of the product only worked of *[sic]* there was forever going AUM.
>
> There is no way to earn yield by holding the assets at Anchorage, the assets are sent there and then moved to a tier 3 platform such as a smaller OTC desk to lend the coins out to market makers or to be traded where you are then provided a small percentage of the gains made on the trading of your assets!
>
> Please see the [] link below to the video Zach Rector uploaded on twitter. I believe he was threatened with legal action so the video's were taken down off X, but someone has re-uploaded them to Youtube.

*Id.* (alterations in amended complaint).

Plaintiffs allege that Rector's videos have damaged their reputation and business by painting Claver "as someone who cannot be trusted" and "who will lie or conceal material information from potential business partners." Dkt. No. 9 ¶ 61. According to the amended complaint, after Rector posted his videos, one potential investor emailed Claver: "I'm going to have to wait until the whole fraud issue is dealt with that's recently come up." *Id.* ¶ 65. Claver's

companies have lost clients and "fielded a plethora of phone calls and emails from concerned clients since the videos dropped." *Id.* ¶ 66.

Claver and his companies filed this lawsuit in January 2026, and filed an amended complaint later that month, asserting claims for defamation, tortious interference, conspiracy, and breach of contract. Dkt. Nos. 1, 9. In May 2026, Caleb & Brown sent a clarification letter to the client who received the allegedly defamatory email, seeking to "correct and/or clarify certain statements" in the original email. Dkt. No. 32-1 at 2, Dkt. No. 36 at 8. Rector, Entrepreneur, and Caleb & Brown answered the amended complaint (Dkt. Nos. 11, 12, 33) and then filed motions for expedited dismissal under UPEPA or, alternatively, for judgment on the pleadings. Dkt. Nos. 15, 35; *see also* WASH. REV. CODE § 4.105.020; FED. R. CIV. P. 12(C). Those motions are now fully briefed, and the Court heard oral argument on August 6, 2026. Dkt. Nos. 29, 30, 44, 45, 47.

## II. ANALYSIS

### A. Legal Standard Under UPEPA

"[T]he Washington legislature enacted UPEPA 'to provide an expedited process for dismissing lawsuits that target activities protected by the First Amendment, such as freedom of speech, press, assembly, petition, and association on matters of public concern.'" *Valve Corp. v. Bucher Law PLLC*, 571 P.3d 312, 317 (Wash. Ct. App. 2025) (quoting *M.G. v. Bainbridge Island Sch. Dist. #303*, 566 P.3d 132, 145 (Wash. Ct. App. 2025)). Although UPEPA is a creature of Washington law, it can nonetheless be applied by federal courts. *See, e.g.*, *Project Veritas v. Leland Stanford Jr. Univ.*, C21-1326 TSZ, 2022 WL 1555047, at *3–4 (W.D. Wash. May 17, 2022). But "when an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Al-Albustani v. Alger*, No. C22-5238JLR, 2022 WL 3213331,

at *3 (W.D. Wash. Aug. 9, 2022) (quoting *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018)).

Defendants attack the legal sufficiency of Claver's claims, so the Court will apply the Rule 12(b)(6) standard—which is "functionally identical" to the Rule 12(c) standard that Defendants invoke in the alternative. *Gregg v. Hawaii, Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017). In evaluating either type of motion, a court examines the complaint to determine whether, assuming the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1068 (9th Cir. 2020) ("[A] Rule 12(c) motion for judgment on the pleadings is properly granted only when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." (citation modified)). A claim is plausible if the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

Along with dismissal—which is independently available under Rule 12(c)—a moving party that prevails on a UPEPA motion is entitled to attorney's fees, costs, and reasonable litigation expenses.[3] WASH. REV. CODE § 4.105.090(1). For the motion to come within UPEPA's ambit, three requirements must be met: First, the defendant must establish that the action is one to which UPEPA applies. Second, the plaintiff must fail to establish a statutory exception to UPEPA. And third, either the plaintiff must "fail[] to establish a prima facie case as to each essential element of the cause of action" or the defendant must show that the plaintiff has "failed to state a cause of

[3] UPEPA also instructs courts to "dismiss with prejudice" failed claims. WASH. REV. CODE § 4.105.060(1). But, as discussed below, because this conflicts with the applicable federal procedural rules, the Court applies the federal rules here. *See Al-Albustani*, 2022 WL 3213331, at *6 n.4 (citing *Planned Parenthood*, 890 F.3d at 834).

action upon which relief can be granted" or that "[t]here is no genuine issue as to any material fact and the [defendant] is entitled to judgment as a matter of law[.]"[4] *Law Off. of John Randolph, PLLC v. EWU Media LLC*, 589 P.3d 799, 810–11 (Wash. Ct. App. 2026) (quoting WASH. REV. CODE § 4.105.060(1)).

Because UPEPA's first two prongs are relevant only to attorney's fees and costs, the Court will begin by considering whether Plaintiffs' amended complaint fails to state a claim on which relief may be granted. In doing so, the Court considers each cause of action in turn. Finding all the claims legally deficient, the Court will then turn to the other requirements of UPEPA to determine whether attorney's fees and costs are available.

**B. Defamation (Counts I & III)**

Plaintiffs' first and third causes of action are for defamation (or defamation per se)[5] against Rector and Caleb & Brown, respectively. To state a claim for defamation in Washington, a plaintiff must plead: "(1) a false statement, (2) publication, (3) fault, and (4) damages." *Duc Tan v. Le*, 300 P.3d 356, 363 (Wash. 2013). A statement that is either true or opinion is not actionable. *Robel v. Roundup Corp.*, 59 P.3d 611, 621 (Wash. 2002). To establish truth, a defendant "need not prove the literal truth of every" challenged statement, but only "that the statement is substantially true or that the gist of the story"—i.e., "the portion that carries the 'sting'"—"is true." *Mark v. Seattle Times*, 635 P.2d 1081, 1092 (Wash. 1981). And to distinguish between fact and opinion (a "sometimes blurry" line) courts consider the statement's medium and context, its

[4] The defendant must also file the UPEPA motion within 60 days of being served with a complaint asserting a cause of action covered by UPEPA. WASH. REV. CODE § 4.105.020(2). Plaintiffs do not contend that either of the pending UPEPA motions is untimely.

[5] A defamation per se claim asserts that the allegedly defamatory statements were injurious enough to excuse the plaintiff from proving actual damages. *Maison de Fr., Ltd. v. Mais Oui!, Inc.*, 108 P.3d 787, 794 (Wash. Ct. App. 2005). "A publication is defamatory per se (actionable without proof of special damages) if it '(1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive him [or her] of the benefit of public confidence or social intercourse, or (2) injures him [or her] in his [or her] business, trade, profession[,] or office.'" *Id.* (quoting *Caruso v. Loc. Union No. 690*, 670 P.2d 240, 245 (Wash. 1983)).

audience, and "whether the statement implies undisclosed facts." *Davis v. Fred's Appliance, Inc.*, 287 P.3d 51, 60 (Wash. Ct. App. 2012) (citing *Dunlap v. Wayne*, 716 P.2d 842, 848 (Wash. 1986)).

While the Ninth Circuit has not decided whether First Amendment principles impose a heightened pleading standard on defamation claims, *Miller v. Sawant*, 18 F.4th 328, 337 n.9 (9th Cir. 2021), the complaint must, at the least, allege sufficient facts to support an inference that the challenged statements are factual and not opinion. *See Tull v. Higgins*, No. 21-CV-01566-DMR, 2021 WL 6116971, at *10–11 (N.D. Cal. Dec. 27, 2021) (allegations generically describing challenged statements failed to establish factuality and thus failed to state a defamation claim). The complaint should therefore typically set forth the "specific false or defamatory statements" on which the claim is premised. *Montano v. Dep't of Health*, No. 3:24-CV-05850-DGE, 2025 WL 1434743, at *5 (W.D. Wash. May 19, 2025); *see also Hadnagy v. Moss*, No. 2:23-CV-01932-BAT, 2024 WL 1328568, at *8 (W.D. Wash. Mar. 28, 2024) ("To proceed on a claim of defamation, Plaintiffs must plausibly plead the alleged 'false and defamatory' statements, i.e., to whom, when, and where these statements were made.").

The amended complaint lists eight allegedly defamatory statements—five from Rector's videos, and three from Caleb & Brown's email to its client. Dkt. No. 9 ¶¶ 72, 91. Plaintiffs also suggest that Caleb & Brown defamed Claver by republishing Rector's video via a hyperlink in its client email. *Id.* ¶ 57. Before turning to the claims against Caleb & Brown, the Court considers each of Rector's alleged statements to determine whether they support a plausible defamation claim.

1. <u>Statements by Rector</u>

*(i)* Statements 1 & 3:

> (1) Mr. Claver "lied…about some things that happened in the past" and further "lied to me about their business history about a lawsuit that

> involved their private equity dealings," both in clear reference to the Verivend suit.
>
> (3) Mr. Claver has "covered up…his frauds."

Dkt. No. 9 ¶ 72.a, .c.

The first and third sets of statements identified in the amended complaint come from Rector's discussion of the *Verivend* lawsuit in his live stream on X and Part 1 of his two-part video series. Dkt. No. 9 ¶ 40. According to the amended complaint, in those videos, Rector said that Claver "lied … about some things that happened in the past"; "'didn't disclose' things"; and "lied to me about [Claver and his business partner's] business history about a lawsuit that involved their private equity dealings[.]" *Id.* ¶¶ 40, 72.a. Rector also allegedly claimed that Claver "covered up … his frauds"—i.e., downplayed the *Verivend* lawsuit—in conversation with Rector. Dkt. No. 29 at 10, 16–17 ("Statement 3, like Statement 1, accuses Plaintiffs of covering up fraud … separate and apart from the Verivend lawsuit[,]" namely that Claver "l[ied] to Rector about the Verivend lawsuit and conceal[ed] information in the course of private business dealings.").

The gist of Plaintiffs' challenge is not that Rector inaccurately reported on the wrongdoing Claver admitted in the *Verivend* lawsuit, but that Rector falsely claimed that Claver misled him *about* the lawsuit. Plaintiffs insist that Rector, in fact, "knew about the *Verivend* suit … in late 2023" and that Claver never "lied [or] concealed information from Mr. Rector in an effort to mislead him[.]" *Id.* ¶ 75.a. Put differently, Claver doesn't dispute that he lied to Schepens and others, but insists he never lied *about* lying.

To begin with, only a few snippets of the relevant portions of the videos appear in the pleading. However, the parties agree (and Plaintiffs' counsel confirmed at oral argument) that the Court may consider the transcripts of the videos and the videos themselves in resolving these motions. Dkt. Nos. 16-3, 17, 18, 29-2. Under the doctrine of incorporation by reference, a court

deciding a motion to dismiss on the pleadings may consider documents to which the complaint refers extensively or those that "form[] the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The amended complaint centers almost entirely around Rector's videos; and Rector's allegedly defamatory statements in the videos are the basis of most of Plaintiffs' claims. Thus, the Court may consider the videos and their transcripts at this stage.

Considered in context, Plaintiffs fail to plausibly allege that statements 1 and 3, even assuming they are false, meaningfully contributed to the "sting" of Rector's reporting about the *Verivend* lawsuit. *See Gaffney v. Scott Pub. Co.*, 212 P.2d 817, 820 (Wash. 1949) (holding that series of articles had to be considered "as a whole and not in part or parts detached from the main body"). "The 'sting' of a report is defined as the gist or substance of a report when considered as a whole." *Herron v. KING Broad. Co.*, 776 P.2d 98, 102 (Wash. 1989). When a defendant makes a mixture of true and false statements, "a false statement (or statements) affects the sting … only when significantly greater opprobrium results from the report containing the falsehood than would result from the report without the falsehood." *Mohr v. Grant*, 108 P.3d 768, 775 (Wash. 2005) (quoting *Herron*, 776 P.2d at 102). "The question is whether the false statement has resulted in damage … distinct from that caused by true negative statements also contained in the same report." *Herron*, 776 P.2d at 103. Put differently, a statement is actionable only if "the substance of the statement makes substantial danger to reputation apparent." *Mark*, 635 P.2d at 1092 (internal quotation marks omitted) (quoting *Taskett v. KING Broad. Co.*, 546 P.2d 81, 84 (Wash. 1976)).

The relevant portions of Rector's videos largely describe the allegations in the *Verivend* lawsuit and Claver's admissions in his answer. Thus, Rector begins his Part 1 video holding a copy of the *Verivend* complaint, which he reads from throughout and projects onto the screen for his audience to read along. Rector then displays the answer, reads several of Claver's admissions, and displays a version of the docket while urging viewers to "go to the public court docket" and

look for themselves "at everything that [Claver] admitted to." Dkt. No. 16-3 at 11:21–22. Rector then discusses other aspects of the *Verivend* lawsuit and record, and summarizes:

> There's a lot that [Claver] has admitted to. And this is payments that he fabricated: He created a fake website, fake email, fabricated screenshots of fake wire transfers.
>
> And Verivend found out about this because [Shepens] was waiting for … all of this equity that [Claver] was supposed to be raising to come in, and these wire transfers to come in. And [Claver], instead of admitting that he hadn't raised the capital, he tried to blame Verivend.

Dkt. No. 16-3 at 12:1–11. Rector later sums up (somewhat colorfully) that investors should be skeptical of accepting "a 'trust me, bro' relationship" with Claver. *Id.* at 23:21–24:1.

Plaintiffs do not allege that Rector inaccurately reported on the admissions in the *Verivend* lawsuit. Instead, they focus on Rector's statements that Claver (and non-party Max Avery), "lied to [Rector] about" the lawsuit.[6] Dkt. No. 16-3 at 5:10–16. Plaintiffs allege that Rector's "suggestion that Mr. Claver lied and concealed information from Mr. Rector in an effort to mislead him is false." Dkt. No. 9 ¶ 75.a.

Even assuming this is so, Rector's statement accusing Claver of covering up the lawsuit would have no material effect on the video's "sting." The gist of the videos is that Claver misled business partners, impersonated Verivend employees, and fabricated emails and screenshots to conceal his unsuccessful fundraising efforts—facts Claver does not dispute. And the "sting" is that Claver's efforts to cover up his misrepresentations undermine his trustworthiness. Whether Claver also covered up the same misconduct by downplaying the lawsuit to Rector in private adds no distinct opprobrium to the true statements that are the bulk of Rector's commentary on the matter. The allegedly untrue cover-up (misleading Rector) is simply cumulative of the admitted

[6] Although the video never explains how Claver supposedly downplayed the lawsuit, Rector alludes to statements by Claver characterizing it as "just a copyright infringement case" and "a misunderstanding" and advises viewers to reject any such gloss advanced by Claver. Dkt. No. 16-3 at 12:15–18.

cover-ups (spoofing emails, faking screenshots, impersonating employees). And its addition to Rector's reporting does not plausibly enhance the resulting harm. *See Mark,* 635 P.2d at 1092–93 (finding no significantly greater opprobrium from statement that plaintiff defrauded the State out of $300,000 as opposed to $200,000); *Valdeman v. Martin*, No. 75849–7–I, 2017 WL 6336018, at *3 (Wash. Ct. App. 2017) (same, as to statement that plaintiff employed a sex offender who signed a contract using an alias, where plaintiff did employ a sex offender who concealed his identity, but employee had not signed using an alias); *cf. Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 n.6 (D.C. Cir. 1984) (explaining that overstating an individual's number of burglary convictions would be inactionable if "the essentially derogatory implication of the statement ('he is an habitual burglar') is correct"), *vacated on other grounds*, 477 U.S. 242 (1986).

Accordingly, Plaintiffs fail to plausibly allege that statements 1 and 3 are actionably false.[7]

*(ii)* Statements 2 & 4:

> (2) "lies are being told" by Mr. Claver to the public based on DWP's funds and that "publicly he [Mr. Claver] is making claims that are not true."
>
> (4) Mr. Claver has lied to the public about the "returns, or lack thereof, in Digital Wealth Partners."

Dkt. No. 9 ¶ 72.b, .d.

Plaintiffs contend that the second and fourth statements identified in the amended complaint accuse Claver of dishonesty separate from that to which he admitted in the *Verivend* lawsuit: namely, that Claver has publicly exaggerated the performance of his funds. Rector responds that, to the extent these statements concern Claver's funds, they are nevertheless

[7] Because the Court finds that the first and third sets of statements do not materially affect the truth of Rector's discussion of the *Verivend* lawsuit, it does not reach Rector's alternative argument that the statements are protected by the fair reporting privilege.

inactionable because they merely express Rector's opinion based on disclosed facts about the credibility of Claver's claims. The Court agrees that these statements, as plead, are not actionable.

To determine whether a statement is fact or opinion, the Court must consider the totality of its context, including "(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." *Robel*, 59 P.3d at 622 (citing *Dunlap*, 716 P.2d at 848); *see also Info. Control Corp. v. Genesis One Comput. Corp.*, 611 F.2d 781, 783–84 (9th Cir. 1980) (considering similar contextual factors). When a speaker "outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Partington v. Bugliosi*, 56 F.3d 1147, 1156–57 (9th Cir. 1995). "[E]ven apparent statements of fact may assume the character of statements of opinion, … when made in public debate, heated labor dispute, or other circumstances in which an audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole[.]" *Info. Control Corp.*, 611 F.2d at 784 (citation modified).

In distinguishing fact from opinion, the Court must consider the statements in their entirety and not "particular phrase[s] or sentence[s]" in isolation. *Info. Control Corp.*, 611 F.2d at 784. Doing so requires some additional work here, as the amended complaint takes liberties in paraphrasing and selectively quoting what Rector actually said. For instance, the fourth statement, as paraphrased in the amended complaint, is that "Mr. Claver has lied to the public about the 'returns, or lack thereof, in [DWP].'" Dkt. No. 9 ¶ 72.d. Rector's actual statement is a prefatory remark, indicating that in "today's video, … we will address the returns or lack thereof in the [DWP] funds." Dkt. No. 16-3 at 3:21–22. Similarly, the second statement purportedly begins, "'lies are being told' by Mr. Claver to the public based on DWP's funds[.]" Dkt. No. 9 ¶ 72.b.

The actual statement is: "But when I know lies are being told, I don't like that."[8] Dkt. No. 29-2 at 57:8–9.

Neither of these statements articulates a factual claim (apart from Rector's agenda for the video). And while the Court must consider their context to determine whether these statements are fact or opinion, it is Plaintiffs' burden to identify the statements on which their claim is based. They may not "belatedly rely" on statements "not labeled as false in the complaint" to make out a defamation claim. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1098 (4th Cir. 1993) (citing *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992)).

Considered in context, the statements identified in the amended complaint reflect Rector's nonactionable view, based on disclosed facts, that he does not find Claver's representations about DWP's funds to be credible. Claver insists these statements make "factual assertion[s] that may be proven true or false." Dkt. No. 29 at 18. But even statements that, in some sense, are theoretically falsifiable must "be read as [the author's] 'personal conclusion about the information presented, *not as a statement of fact*'" if "the author presents the factual basis for his statement[.]" *Partington*, 56 F.3d at 1156 (quoting *Phantom Touring, Inc.*, 953 F.2d at 730); *see also Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1102–03 (N.D. Cal. 1999) (accusation that plaintiff embezzled $33,000 was nonactionable where defendant disclosed the underlying basis for believing the accusation); *Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446, 453–54 (3d Cir. 1987) (same as to another embezzlement accusation); *Hill v. Cosby*, 665 F. App'x 169, 173–77 (3d Cir. 2016) (implication that plaintiff lied about past abuse was nonactionable where speaker disclosed the basis for the accusation).

[8] The rest of the second statement—"publicly he [Mr. Claver] is making claims that are not true"—reads, in context: "And so, with those funds, I think that he could all give us … make us feel more comfortable, at least for me, if we could get those statements audited. And I just find it very contradicting that he's telling investors not to talk about it public[ly], but yet, public[ly], he's making claims that are not true." Dkt. No. 29-2 at 57:11–17 (ellipses in original).

Rector's brief points to numerous segments of his videos in which he identifies the facts underlying his view that Claver is misrepresenting information about DWP's funds. Dkt. No. 30 at 10. For instance, Rector points to Claver's admitted conduct in the *Verivend* lawsuit: "we are talking about a guy who is willing to go as far as fabricating wire transfers; and now we are supposed to be on a 'Trust me, Bro' relationship with his investors and DWP, and 'Trust me, Bro, we've got returns coming your way.'" Dkt. No. 16-3 at 23:21–24:1; *see also* Dkt. No. 29-2 at 61:7–16 ("The only reason why I'm addressing [Claver's claims about his funds] tonight [is] … I recorded a whole 30-minute breakdown, going through this lawsuit [*Verivend*], everything that I know about it, which is a lot more than he's admitting to."). Rector also underscores the lack of transparency around the funds, stating that Claver and DWP "sen[t] out threats to [Claver's] investors, telling them not to share" certain performance reports "publicly[,]" and went as "far as to watermark, with a time stamp, the reports" to deter disclosure. Dkt. No. 16-3 at 22:10–19. And Rector cites what he considered to be Claver's untethered prediction about the value of a digital currency called "XRP," which—according to Rector—further undermined Claver's credibility. Dkt. No. 29-3 at 63:8–24 ("But we have thousands of people, way too many people, that thought it was inevitable that XRP was going to go to a hundred bucks this year [as Claver predicted], and that's fine. But we are here towards the end of the year. It's not going to happen. … I've only shared my concerns [about Claver's funds] privately until I seen [Claver] going crazy with the predictions up until the very end here.").

Plaintiffs do not dispute the accuracy of Rector's statements that Claver faked wire transfers, discouraged investors from disclosing performance reports, or predicted XRP would reach $100 in 2025. Nor do they identify other statements implying some undisclosed, defamatory basis for Rector's incredulousness. Plaintiffs briefly argue that the "disclosed facts … are largely just reiterations of the false and defamatory statement that Claver is lying to the public about the

returns on the funds." Dkt. No. 29 at 17–18. But that is not so: Rector points to Claver's past deceitful acts, his predictions about XRP, and his purported efforts to prevent disclosure of information about the funds. Having disclosed the basis of his claim (implied or otherwise) that Claver misrepresented the returns on his funds, Rector's audience was free to evaluate the underlying facts themselves and draw their own conclusions.

The "medium" and intended "audience" of the videos underscores the nonfactual nature of statements 2 and 4. *See Info. Control Corp.*, 611 F.2d at 784. Courts have recognized that "in the context of the heated debate on the [i]nternet, readers are more likely to understand accusations of lying as figurative, hyperbolic expressions." *Nicosia*, 72 F. Supp. 2d at 1106 (citing *Faltas v. State Newspaper*, 928 F. Supp. 637, 646–48 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998)); *see also Art of Living Found. v. Does*, No. 10-CV-05022-LHK, 2011 WL 2441898, at *7 (N.D. Cal. June 15, 2011) (finding readers "less likely to view statements as assertions of fact" where they appeared "on obviously critical blogs" containing "heated discussion" of plaintiff's organization); *Pardee v. Evergreen Shores Beach Club*, No. 53126-7-II, 2020 WL 3440572, at *7 (Wash. Ct. App. June 23, 2020) (same for statements "posted on a social media page where the audience expects the speaker to use exaggeration, rhetoric, or hyperbole"). Rector is a social media content creator engaged in an apparently heated, online debate in which he claims his "reputation" has been "attacked." Dkt. No. 16-3 at 3:8–11. In this context, Rector's audience would be primed to expect the "use of epithets" such as liar and exaggeration. *Info. Control Corp.*, 611 F.2d at 784.

Considering this context, the second and fourth statements reflect Rector's nonactionable opinion, based on disclosed facts, that Claver's claims about his funds are not credible. These statements do support defamation.

*(iii)* Statement 5:

> (5) Plaintiffs are not undertaking a third-party audit and accordingly have not accurately disclosed performance to investors.

Dkt. No. 9 ¶ 72.e.

The fifth statement in the amended complaint is a paraphrase that contains no quoted language. Rector's actual statement is that "without third-party audited financials of these funds, I am not going to take [Claver] at his word, not after knowing what I know." Dkt. No. 16-3 at 24:20–23. Plaintiffs rely on "defamation by implication," which exists when "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts." Dkt. No. 29 at 18 (quoting *Corey v. Pierce Cnty.*, 225 P.3d 367, 373 (Wash. Ct. App. 2010)). According to Plaintiffs, the "natural implication" of Rector's statement is that Plaintiffs had not performed a third-party audit of their funds. *Id.* Plaintiffs allege that this is false because "Plaintiffs are undertaking a third-party audit and have at all times accurately disclosed performance to investors." Dkt. No. 9 ¶ 75.c.

The Court disagrees that Rector's statement implies any factual claim about Plaintiffs' auditing process. The statement simply expresses Rector's view that, considering the other matters discussed in the videos, Rector would not "take [Claver] at his word" about the performance of DWP's funds "without third-party audited financials[.]" Dkt. No. 16-3 at 24:20–23. As discussed above, Rector discloses the basis of his skepticism: Claver's prior dishonest acts (admitted in the *Verivend* lawsuit), his predictions about XRP, and the alleged secrecy around DWP's funds. No reasonable audience member would interpret Rector's statement as asserting that Claver and his companies have not performed an audit or are not doing so. *See Camer v. Seattle Post-Intelligencer*, 723 P.2d 1195, 1202 (Wash. Ct. App. 1986) (explaining that distinguishing fact from opinion involves considering how "ordinary persons hearing" the statement would "perceive" it

(citation omitted)). Indeed, there is no reason a viewer would have thought Rector had any insight into such matters. And in any event, even if Rector implied that Plaintiffs had not performed a third-party audit at the time he recorded his video, the amended complaint does not say otherwise: It merely alleges Plaintiffs were "undertaking" a third-party audit—i.e., in the process of doing so—when they filed the amended complaint. Dkt. No. 9 ¶ 75.c.

Accordingly, Plaintiffs fail to plausibly allege that the fifth statement by Rector was factual or actionably false.

Because none of the identified statements support a defamation claim against Rector, the Court will dismiss Count I of the amended complaint.

2. Statements by Caleb & Brown

Because Plaintiffs fail to state a defamation claim against Rector, they cannot maintain a claim against Caleb & Brown for republishing one of Rector's videos.[9] As to the statements in its client email, Caleb & Brown contends that (1) the statements are all true or nonactionable opinion, (2) the statements are protected by a privilege, (3) Plaintiffs fail to plead actual malice, and (4) Plaintiffs have no recoverable damages because Caleb & Brown's clarification letter to its client forecloses reputational or presumed damages. Dkt. No. 35 at 10–17. Because the Court agrees with Caleb & Brown on its last point, the Court does not reach the firm's other arguments.

Caleb & Brown argues that, under Washington's Uniform Correction or Clarification of Defamation Act ("UCCDA"), Plaintiffs are barred from recovering damages on their defamation

[9] Moreover, as at least one court in this District has explained, "[a] mere reference" to a defamatory publication "does not directly publish the defamatory material to a new audience" and thus does not constitute a separate instance of defamation. *U.S. ex rel. Klein v. Omeros Corp.*, 897 F. Supp. 2d 1058, 1074 (W.D. Wash. 2012) (holding that posting a URL to a message board did not constitute republication). As alleged in the amended complaint, Caleb & Brown—like the defendant in *Omeros*—provided only a hyperlink to Rector's video without repeating any of its contents. *Id.* at 1073. Merely informing a "new audience where the [allegedly] defamatory material can be found" is "not a publication of the contents of the materials referred to." *Id.* at 1074. Plaintiffs' republication claim against Caleb & Brown fails for this independent reason as well.

claim. *See* WASH. REV. CODE § 7.96.010–901. In particular, the firm invokes a provision of UCCDA that immunizes a speaker for "injury to reputation or presumed damages" if the speaker issues "a timely and sufficient correction or clarification" of an allegedly defamatory statement.[10] *Id.* § 7.96.060. A clarification is sufficient if it:

> (a) Is published with a prominence and in a manner and medium reasonably likely to reach substantially the same audience as the publication complained of;
>
> (b) Refers to the statement being corrected or clarified and:
>
> > (i) Corrects the statement;
> >
> > (ii) In the case of defamatory or false meaning arising from other than the express language of the publication, disclaims an intent to communicate that meaning or to assert its truth; or
> >
> > (iii) In the case of a statement attributed to another person, identifies the person and disclaims an intent to assert the truth of the statement;
>
> (c) In advance of the publication, is provided to the person who has made a request for correction or clarification; and
>
> (d) Accompanies and is an equally prominent part of any electronic publication of the allegedly defamatory or otherwise actionable statement by the publisher.

*Id.* § 7.96.070(2).

Because Caleb & Brown issued such a clarification, the firm argues that Plaintiffs cannot recover reputational or presumed damages. And because Plaintiffs fail to allege any other damages (and cannot recover punitive damages under Washington law), Caleb & Brown argues the defamation claim fails across the board. The Court agrees.

At oral argument, Plaintiffs agreed that the Court may consider the clarification letter sent to the Caleb & Brown client who received the allegedly defamatory email. The letter is attached to a declaration submitted with Caleb & Brown's motion (Dkt. No. 36 at 23–24) and was filed

[10] A clarification is "timely if it is published before, or within thirty days after, receipt of a request for correction or clarification … whichever is later[.]" WASH. REV. CODE § 7.96.070(1). It does not appear that Plaintiffs ever issued a request for correction or clarification, and they do not claim that Caleb & Brown's clarification was untimely.

separately by Plaintiffs, who received a copy the day it was sent (Dkt. No. 32). Because no party disputes the letter's authenticity, and Caleb & Brown only seeks to show that the letter "says what it says"—not the truth of any facts asserted therein—the Court agrees that the letter is subject to judicial notice. *Sarmiento v. Sealy, Inc.*, 367 F. Supp. 3d 1131, 1143 (N.D. Cal. 2019); *see also* FED. R. EVID. 201(b) (authorizing judicial notice of adjudicative facts "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

The letter sets forth (apparently in full) the email from Caleb & Brown's associate and then provides the following "correct[ions] and/or clarif[ications]":

> [Our associate's] reference to being "vulnerable to being scammed," or statements, if any, about being "cautious" and "more informed," were intended to express his opinion that, in general, it is prudent to exercise caution when dealing with cryptocurrencies. Caleb & Brown did not intend to imply and does not assert that Digital Wealth Partners or its founder, Jacob Claver, or any related or affiliated entities, including Digital Ascension Group (collectively, "Claver"), are, as a factual matter, scamming you, and hereby expressly disclaims such implication and any intent to assert the truth of that statement.
>
> As for [our associate's] reference to Celsius and "forever going AUM," Caleb & Brown did not intend to imply or otherwise communicate that, as a factual matter, Claver has ever committed fraud or engaged in other unlawful or wrongful conduct. Caleb & Brown hereby disavows such implication and disclaims any intent to assert the truth of any such statement.
>
> [Our associate's] statement in the third paragraph above regarding earning yield by holding the assets at Anchorage and the possibility of trading or lending assets merely describes [our associate's] opinion regarding general market practices and risks. Caleb & Brown does not assert, and did not intend to communicate factual assertions that your assets would be traded or lent by Claver, specifically, that it is impossible to "earn yield by holding the assets at Anchorage," or that you would be provided a small percentage of the gains made on the trading of your assets. To the extent such opinion statements could be construed as statements of fact, Caleb & Brown disavows any such implications and disclaims any intent to assert the truth of any such statement.

Dkt. No. 32, Dkt. No. 36 at 23–24.

Caleb & Brown's letter meets UCCDA's requirements. First, it is published in a medium "likely to reach substantially the same audience" as the initial email—a letter to the original recipient. WASH. REV. CODE § 7.96.070(2)(a). Plaintiffs briefly argue that the letter does not "insulate" Caleb & Brown from liability for "the loss of other prospective clients' business" or "similar statements made to other individuals[.]" Dkt. No. 44 at 22. But the amended complaint identifies only one allegedly defamatory statement by Caleb & Brown sent to one client. Plaintiffs' conclusory allegations alluding to other possible similar statements are insufficient to either plead a defamation claim or give rise to a requirement under UCCDA that Caleb & Brown publish its clarification letter more broadly. *See* Dkt. No. 9 ¶¶ 7, 59, 96, 97.

Second, Caleb & Brown's letter refers to the relevant statements and corrects or disclaims any intent to communicate a defamatory meaning. WASH. REV. CODE § 7.96.070(2)(b). The letter addresses each statement identified in the amended complaint. *See* Dkt. No. 9 ¶ 91.a–c. It explains that the associate's reference to Celsius and "forever going AUM" "did not intend to imply" that "Claver has ever committed fraud or engaged in other … wrongful conduct." Dkt. No. 36 at 23; *see* Dkt. No. 9 ¶ 91.a. And it expressly clarifies that Caleb & Brown "does not assert, and did not intend to communicate factual assertions that your assets would be traded or lent by Claver, … that it is impossible to 'earn yield by holding the assets at Anchorage,' or that you would be provided a small percentage of the gains made on the trading of your assets." Dkt. No. 36 at 24; *see* Dkt. No. 9 ¶ 91.b, .c. In sum, the letter directly disclaims the specific defamatory implications asserted by Plaintiffs as the basis for their defamation claim against Caleb & Brown.

Finally, Plaintiffs do not dispute that Caleb & Brown sent them a copy of the letter and that the letter is "equally prominent" to the allegedly defamatory client email. *See* WASH. REV. CODE § 7.96.070(2)(c), (d). Because the letter meets UCCDA's requirements, Plaintiffs "may not recover damages for injury to reputation or presumed damages[.]" *Id.* § 7.96.060.

While UCCDA does not prevent Plaintiffs from recovering "other damages permitted by law" (WASH. REV. CODE § 7.96.060), Plaintiffs fail to allege any other recoverable damages. The amended complaint generically alleges "damage to [Plaintiffs'] reputation, loss of goodwill in the community, and loss of potential clients/income." Dkt. No. 9 ¶ 97. But this allegation is too conclusory and identifies no specific client lost because of the email—including the only client who allegedly received it. Moreover, the loss of "reputation" and "goodwill" (*id.*) are precisely the sort of damages UCCDA forecloses. Finally, as Caleb & Brown notes, punitive damages are unavailable for defamation under Washington law. *Schmalenberg v. Tacoma News, Inc.*, 943 P.2d 350, 363 (Wash. Ct. App.1997).

Because Plaintiffs fail to allege recoverable damages against Caleb & Brown—a necessary element of defamation—the Court will dismiss Count III.

**C. Tortious Interference (Counts II & IV)**

Plaintiffs' tortious interference claims rise or fall with the defamation claims. In Washington, a tortious interference claim requires five elements: (1) "a valid contractual relationship or business expectancy"; (2) "that defendants had knowledge of that relationship"; (3) "an intentional interference inducing or causing a breach or termination of the relationship or expectancy"; (4) "an improper purpose" or use of "improper means" by the defendant; and (5) "resultant damage." *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997) (citation omitted). However, a tortious interference claim premised on constitutionally protected speech, is "subject to the same First Amendment requirements that govern actions for defamation." *Gardner v. Martino*, 563 F.3d 981, 992 (9th Cir. 2009); *see also Straw v. Avvo, Inc.*, No. C20-0294JLR, 2020 WL 5066939, at *5 n.4 (W.D. Wash. Aug. 27, 2020) (collecting cases). Thus, if a defendant cannot "be found liable for defamation," a claim for "intentional interference with contractual relations" (or the like) based on the same speech "is not actionable[.]" *Button v.*

*Jimison*, No. 3:25-CV-05622-DGE, 2026 WL 149016, at *9 (W.D. Wash. Jan. 20, 2026) (quoting *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 973 (3d Cir. 1985)).

Because Plaintiffs fail to state a claim for defamation, their tortious interference claims based on the same challenged statements necessarily fail. Moreover, Plaintiffs' tortious interference claim against Caleb & Brown fails because, as discussed above, the amended complaint does not allege any loss of business attributable to Caleb & Brown's email or that Plaintiffs suffered damages as result.

The Court will therefore dismiss the Counts II and IV of the amended complaint.

**D. Conspiracy (Count V)**

Plaintiffs' civil conspiracy claims also fail. To establish civil conspiracy, a plaintiff must "[p]rove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy." *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 52 P.3d 30, 35 (Wash. Ct. App. 2002), *as corrected* (Sept. 23, 2002) (citation omitted). Civil conspiracy is not, by itself, an actionable claim. *W. G. Platts, Inc. v. Platts*, 438 P.2d 867, 871 (Wash. 1968); *Rodriguez v. Larabee*, No. C16-0446RSM, 2016 WL 5851856, at *3 (W.D. Wash. Oct. 6, 2016) ("Civil conspiracy is generally not recognized in the law as a standalone cause of action; there must ordinarily be an underlying tort."). Because Plaintiffs fail to plead an underlying tort committed by either Rector or Caleb & Brown, the conspiracy claim necessarily fails.

The Court will dismiss Count V of the amended complaint.

**E. Breach of Contract (Count VI)**

Plaintiffs' sole claim against Entrepreneur alleges that the company breached an affiliate agreement with DAG that obligated Entrepreneur to refrain from making "false or misleading

claims about [DAG's] services." Dkt. No. 9 ¶ 115–20. The amended complaint, however, contains no allegations of *any* claims by Entrepreneur—false, misleading, or otherwise. Plaintiffs apparently seek to hold Entrepreneur liable for Rector's statements in his videos. But the videos bear no indication that Rector is speaking on behalf of Entrepreneur. And, in any event, for the reasons already discussed, his statements were not actionably false.

The Court will dismiss Count VI.

**F. Attorney's Fees**

Having found that Plaintiffs "fail[] to state a cause of action upon which relief can be granted[,]" the Court must now consider whether the other requirements of UPEPA are met such that Defendants are entitled to attorney's fees, costs, and reasonable litigation expenses. WASH. REV. CODE §§ 4.105.060(1), 4.105.090(1). To invoke the statute, a moving party must first carry its burden to establish that UPEPA applies to the claims at issue. *EWU Media*, 589 P.3d at 810 (citing WASH. REV. CODE § 4.105.060(1)(a)). As relevant here, UPEPA applies to any civil cause of action based on a person's "[c]ommunication[s] on an issue under consideration" in a "judicial … proceeding" or their exercise of constitutionally protected speech "on a matter of public concern." WASH. REV. CODE § 4.105.010(2)(b), (c). If the moving party satisfies this requirement, the burden shifts to the responding party to establish that a statutory exception to UPEPA applies. *See* WASH. REV. CODE § 4.105.060(1)(b).

The Court finds that UPEPA applies to all of Plaintiffs' claims, that no statutory exception applies to the claims against Rector and Entrepreneur, but that an exception for commercial speech applies to the claims against Caleb & Brown. Accordingly, only Rector and Entrepreneur may recover litigation expenses, attorney's fees, and costs.

1. <u>Whether UPEPA applies</u>

UPEPA applies to causes of action against a person based on, among other things, the exercise of their constitutional "right of freedom of speech or of the press" in connection with "a matter of public concern."[11] WASH. REV. CODE § 4.105.060(2)(c). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Spratt v. Toft*, 324 P.3d 707, 713 (Wash. Ct. App. 2014) (internal quotation marks omitted) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). In evaluating the public import of a particular statement, courts consider its "content, form, and context …, as revealed by the whole record." *Jha v. Khan*, 520 P.3d 470, 477–78 (Wash. Ct. App. 2022) (quoting *Billings v. Town of Steilacoom*, 408 P.3d 1123, 1139 (Wash. Ct. App. 2017)).

Rector's videos relate to matters of public concern: whether investors should entrust their money to someone who claims a social media audience "exceeding 500,000 followers" and holds himself out as "a pioneer in the digital asset and cryptocurrency space." Dkt. No. 9 ¶¶ 2, 21. Plaintiffs' attempt to recast the videos as part of a "personal"—and thus private—dispute (Dkt. No. 29 at 10) improperly construes Rector's statements "in the narrowest way possible, rather than as a whole as the law dictates." *Jha*, 520 P.3d at 478. Considering the videos in their totality, members of the public contemplating an investment in Claver's funds would find Rector's discussion of the *Verivend* lawsuit highly relevant to their decision of whether to invest. *See, e.g.*, Dkt. No. 9 ¶ 65 (recounting statement by potential investor that he would "have to wait until the whole fraud issue is dealt with" before investing). Indeed, Plaintiffs allege that the videos have been "picked up" by "multiple other content creators in the crypto/digital asset space" as well as

[11] Because the Court finds that the statements at issue concern "a matter of public concern[,]" it does not reach Defendants' alternative argument that the statements are also "on an issue under consideration or review in a … judicial … proceeding[.]" WASH. REV. CODE § 4.105.010(2)(b), (c).

"trade and online publications" that have written articles about the videos. *Id.* ¶¶ 62–63. Because the videos contain constitutionally protected speech on matters of public concern, UPEPA applies to Plaintiffs' claims against Rector and, by extension, Entrepreneur (which Plaintiffs sue only on account of Rector's speech).

For similar reasons, UPEPA also applies to the claims against Caleb & Brown. While Caleb & Brown's audience was smaller, the subject of its client email was similar: Should investors put their money into Claver's companies? Considering Claver's public stature within the relevant community of digital currency investors, Plaintiffs' claims against Caleb & Brown are likewise based on the firm's speech on a matter of public concern.

UPEPA therefore applies to the claims against all Defendants.

2. Whether a statutory exception applies

Plaintiffs invoke the statutory exception for claims "[a]gainst a person primarily engaged in the business of selling or leasing goods or services" and that "arise[] out of a communication related to the person's sale or lease of the goods or services[.]" WASH. REV. CODE § 4.105.010(3)(a)(iii). This exception, which encompasses essentially commercial speech, applies to the claims against Caleb & Brown but not those against Rector (or Entrepreneur).

a. *Claims against Rector and Entrepreneur*

Plaintiffs argue that Rector's videos relate to his sale of goods or services because Rector is a social media content creator and his videos drive viewership to his channels. Dkt. No. 29 at 11. As Rector notes, this expansive interpretation of the commercial speech exception would exclude from UPEPA's protection not only social media content creators, but any publisher of books, newspapers, magazines, or other media who relies on viewership for revenue. Such a result would conflict with well-established authority placing such expressive content, though generated for profit, outside the less constitutionally protected category of commercial speech. *See, e.g.*,

*Time, Inc. v. Hill*, 385 U.S. 374, 396 (1967) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02 (1952))); *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) (holding that "a simple profit motive to sell copies of a publication" does not establish commercial speech since that would encompass "virtually any newspaper, magazine, or book for sale"). And because such content is entitled to constitutional protection, Plaintiffs' construction of the commercial speech exception would violate UPEPA's directive that it be "broadly construed and applied to protect the exercise of the right of freedom of speech and of the press[.]" WASH. REV. CODE § 4.105.901. The Court declines to read the exception to essentially swallow UPEPA's protections for content creators who rely on viewership.

Plaintiffs also vaguely suggest that Rector may have been motivated by his "affiliate relationship" with Caleb & Brown in releasing the video, such that the exception applies. Dkt. No. 29 at 11. But the videos never mention Caleb & Brown or its services; and Plaintiffs' speculation about Rector's motives is insufficient to show that he is either "primarily engaged" in selling Caleb & Brown's services or that his videos relate, in any way, to the sale of those services. WASH. REV. CODE § 4.105.010(3)(a)(iii).

Accordingly, no statutory exception under UPEPA applies to the causes of action against Rector and Entrepreneur.

b. *The claims against Caleb & Brown*

Caleb & Brown's email to its client, however, relates directly to the firm's work promoting its brokerage services. Caleb & Brown resists this conclusion, arguing that its email did not reference "Caleb & Brown's own brokerage services" but, instead, discussed only Claver and DWP's services. Dkt. No. 45 at 17. But speech "does not necessarily need to mention one's own

product to be commercial, just as an advertisement may impliedly promote one product by disparaging another[.]" *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, No. 14CV1191 JLS (KSC), 2016 WL 5118530, at *7 (S.D. Cal. Sept. 21, 2016). By criticizing its competitor, the unmistakable thrust of Caleb & Brown's email was to persuade its client to continue to patronize Caleb & Brown rather than move his assets to an assertedly less reliable rival. *See ReSea Project ApS v. Restoring Integrity to Oceans, Inc.*, No. SA-21-CV-1132-JKP, 2023 WL 222244, at *9 (W.D. Tex. Jan. 17, 2023) (disparaging statements about competitor were "commercial speech" subject to lesser First Amendment protection). Given this context, the statements at issue "relate[]" to Caleb & Brown's "sale … of … services"—namely, its business as a cryptocurrency brokerage. WASH. REV. CODE § 4.105.010(3)(a)(iii).

Caleb & Brown argues that, even if the commercial speech exception applies, an exception to that exception brings the claims back within UPEPA's ambit. The firm invokes a provision of UPEPA which states, as relevant: "[UPEPA] applies to a cause of action [otherwise excluded under the commercial speech exception] when the cause of action is … [a] legal action against a person related to the communication, gathering, receiving, posting, or processing of consumer opinions or commentary, evaluations of consumer complaints, or reviews or ratings of businesses." WASH. REV. CODE § 4.105.010(3)(b)(ii). According to Caleb & Brown, this provision applies because, by criticizing Claver and DWP, the firm "communicated to [its client] about reviews of Plaintiffs' business." Dkt. No. 45 at 18.

Caleb & Brown's broad construction of this provision is unpersuasive. Under the doctrine of *noscitur a sociis*, Washington courts do not read words in a statute "in isolation" but determine "the word's meaning … by its relationship to other words in the statute." *Green v. Pierce Cnty.*, 487 P.3d 499, 505 (Wash. 2021); *see also State v. Roggenkamp*, 106 P.3d 196, 200 (Wash. 2005) ("[T]he meaning of words may be indicated or controlled by those with which they are associated"

(quoting *State v. Jackson*, 976 P.2d 1229, 1237 (Wash. 1999))). The phrase "reviews or ratings of businesses" comes third after "consumer opinions or commentary" and "evaluations of consumer complaints[.]" § 4.105.010(3)(b)(ii). Considering this context, "reviews or ratings" must be construed to embrace things similar to the other items on the list—namely, "reviews or ratings" that convey a consumer's or other individual's experience of a product or service. Simply criticizing a competitor cannot be shoehorned into this exception. Interpreting the phrase as Caleb & Brown suggests would effectively extend UPEPA protection to ordinary sales pitches aimed at promoting the speaker's business by undermining its competitor. Applying ordinary principles of statutory interpretation, the Court cannot agree that this provision creates so broad a carve-out from the commercial speech exception.

Accordingly, Caleb & Brown is not entitled to attorney's fees or costs in connection with its motion. Rector and Entrepreneur, however, may move to recover such fees and costs no later than September 23, 2026.

**G. Dismissal shall be without prejudice.**

UPEPA instructs courts to "dismiss with prejudice" claims for which "[t]he responding party failed to state a cause of action upon which relief can be granted." WASH. REV. CODE § 4.105.060(1). Yet Federal Rule of Civil Procedure 15(a) instructs federal courts to freely grant leave to amend "when justice so requires." And when "there is a contest between a state procedural rule and the federal rules, the federal rules of procedure will prevail." *Planned Parenthood*, 890 F.3d at 834.. Rule 15(a)'s liberal approach to amendment supersedes UPEPA's contrary direction. *See Al-Albustani*, 2022 WL 3213331, at *6 n.4 (citing *Planned Parenthood*, 890 F.3d at 834).

Under Rule 15(a), the Court will "grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (quoting *Cook,*

*Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990)). Because it is not clear that the defects in the amended complaint could not be cured, the Court will grant leave to amend.

## III. CONCLUSION

Zach Rector and Entrepreneur Exposed, LLC's motion for expedited relief under UPEPA or, in the alternative, for judgment on the pleadings is GRANTED. Dkt. No. 15. Caleb & Brown Pty. Ltd.'s motion for expedited relief under UPEPA or, in the alternative, for judgment on the pleadings is GRANTED in part. Dkt. No. 35. All claims in the amended complaint (Dkt. No. 9) are DISMISSED without prejudice and with leave to amend. Any amended complaint must be filed no later than September 23, 2026.

Zach Rector and Entrepreneur Exposed, LLC may move to recover court costs, attorney's fees, and litigation expenses related to their motion no later than September 23, 2026.

Dated this 2nd day of September, 2026.

Kymberly K. Evanson
United States District Judge